## North Tower Condominium Association v. Harrisburg Zoning Hearing Board

*Burton D. Morris,* for appellant.
*Bruce I. Kogan,* for applicant/intervenor.

CALDWELL, *J.,* February 17, 1981—This is an appeal from a decision by the Zoning Hearing Board of the City of Harrisburg, which granted a special exception permit to a property owner for the construction of a garage addition to his property at 2841 North Front Street. Appellant is an association composed of the owners of residential units located in a building next to the property in question. The applicant for the permit has intervened in this appeal, and seeks to sustain the board's issuance of the special exception permit.

Before reaching the merits of the case, we must first address the issue of whether the within appeal was taken timely. This subject is governed largely by subsection 908(9) of the Pennsylvania Municipalities Planning Code (MPC) of July 31,

1968, P.L. 805, as amended, 53 P.S. §10908(9)[1] and its interaction with section 2 of the Judicial Code, 42 Pa.C.S.A. §5571(b).[2] Stated simply, the initial question that must be answered is whether a written decision was rendered by the zoning hearing board within 45 days of its last hearing, or whether the board failed to issue a proper decision. In the latter situation the application for the permit would be deemed approved and the 30 day appeal period would be automatically triggered as soon as the original 45 days expired.

Several dates are relevant to our decision. The record discloses that the "last hearing" before the zoning board occurred on August 13, 1980, and that a decision was announced orally by the board on September 10, 1980, granting the special exception. On September 25, 1980, the applicant/intervenor was given written acknowledgment that his application had been approved, which acknowledgment was within the 45 day restriction imposed by subsection 908(9) of the MPC. Findings of fact and conclusions of the board were not filed until October 9, 1980.

The case of A.Z.J.Z., Inc. v. Township of Springfield, 36 Pa. Commonwealth Ct. 161, 387

---

1. The subsection provides in relevant part: "The board . . . shall render a *written decision* . . . within forty-five days after the last hearing before the board . . . where the application is contested or denied, each decision shall be accompanied by findings of fact and conclusions based thereon together with the reasons therefor . . . Where the board fails to render the decision within the period required by this subsection . . . the decision shall be deemed to have been rendered in favor of the applicant. . . ." (Emphasis supplied.)

2. The section states the general rule that appeals to a court "from a tribunal or other government unit . . . shall be commenced within 30 days after the entry of the order from which the appeal is taken. . . ."

A. 2d 675 (1978), governs our conclusions in the case now before us. In A.Z.J.Z., a zoning board denied a variance application and sent written "notice" to the applicant within the 45 day time limit. Its findings of fact and conclusions of law, however, were not issued and filed until nearly a month later, at which time the 45 days had already run. The court rejected applicant's argument that the board had not rendered the requisite decision within 45 days and that, therefore, the application should be deemed approved. The requirement of a written decision within 45 days is satisfied when there is a specific notification in writing to the parties, even if the findings of fact and conclusions of law do not accompany that notification but are filed beyond the 45 day time limit.

Had there been specific notification of all parties in the case before us, the time for appeal would have run 30 days after entry of the board's decision. The problem here, however, is that appellant was never notified as subsection 908(10) of the Pennsylvania Municipalities Planning Code, 53 P.S. §10908(10)[3] mandates. Since North Tower had properly registered with the board during the hearings that ended on August 13, 1980, the zoning board had the duty to inform it of the decision reached. Nevertheless, only the applicant/intervenor received the written acknowledgment of September 25, 1980, that his application had been approved. Moreover, when the board's findings

---

3. The subsection provides as follows: "A copy of the final decision . . . shall be delivered to the applicant personally or mailed to him not later than the day following its date. To all other persons who have filed their name and address with the board not later than the last day of the hearing, the board shall provide by mail or otherwise, brief notice of the decision or findings and a statement of the place at which the full decision or findings may be examined."

were formally filed on October 9, 1980, it was incumbent on the board to notify appellant, and in this responsibility the board was again remiss.

Under the facts presented to us the controlling case is that of Clemens v. Upper Gwynedd Twp. Zoning Hearing Bd., 3 Pa. Commonwealth Ct. 71, 281 A. 2d 93 (1971). In Clemens, opponents had appealed the granting of a special exception. The appeal, however, did not occur until 52 days after the board's decision. The Commonwealth Court was directly confronted with the proper interpretation of the subsection 908(10) notice provision since the lower court had held that failure to give notice to the opponents meant that the appeal was timely. In agreeing, the appellant tribunal held that when an actual, rather than implied, adverse decision is rendered by a zoning board, the appeal period begins to run against protestants only when the board issues notice of the decision to those protestants entitled to notice. Here the decision adverse to the interests of North Tower was actual, as in Clemens, and therefore the 30 day appeal period as to North Tower could not commence running until notice to it was given.

The record reflects that no direct notification by the zoning board was ever given to appellant. It learned of the granting of the special exception on or about November 15, 1980, when construction materials and equipment came onto the applicant/intervenor's property to effect the building project that was the subject of the board's approval. Appellant then began rapid action and filed its appeal within 11 days. Under the circumstances, as governed by case law and statutory language, we must agree with appellant that its appeal was timely and that the merits are properly before us for review.

Insofar as the merits are concerned, we initially reject North Tower's argument that the addition

that applicant/intervenor seeks to construct on his property is the type of "parking garage" that is precluded in an SPD District on any lot abutting Front Street, under Article 1333.07(c)(2). It is true that the property is located in a "Special Planned Development (SPD) District" and is therefore subject to the provisions of Article 1333.07. Nevertheless, as the Harrisburg Zoning Hearing Board noted in its findings, the application was for a special permit to build a garage as an accessory use,[4] which Article 1341.01 expressly permits in all zones except those classified as Residential Limited Zone A.

Further support for viewing the proposed structure as an accessory building rather than as a parking garage is found in the zoning board's findings of fact and conclusions of law filed on October 9, 1980. This document expressly rejects appellant's "parking garage" argument and restricts the building's uses to those customarily attached to accessory, residential garages. Although the term "parking garage" is undefined in the code, we agree with the zoning board that it refers to commercial parking enterprises, whether owned municipally or privately. A survey of the Planning and Zoning Code supports this position in that the term "parking garages" is generally coupled with the term "commercial parking lots." See, e.g., Articles 1333.08(b)(3) and 1333.09(b)(3).

This interpretation is consistent with the current lack of any commercial parking facilities in this general area of Front Street, and recognizes the

---

4. Article 1321.02 defines accessory building as "a building the use of which is customarily incidental to that of another building and which is located on the same lot as that occupied by the main building." Article 1321.03 provides: "'Accessory use' means a use, not otherwise contrary to law, customarily incidental to the principal use of a building, structure or lot. . . ."

long-standing existence of a substantial number of private garages as accessory uses to the structures on that thoroughfare. Although the size of the garage that applicant/intervenor seeks to construct is considerably larger than an accessory garage normally associated with a dwelling, we need not concern ourselves with dimensions except to the extent that they infringe on the required setbacks in an SPD district, pursuant to Article 1333.07(e) of the Planning and Zoning Code.

Under the terms of the code the sole reason that applicant/intervenor required a special permit to construct an accessory garage on his premises was the location of the property in a flood fringe area as designated in Article 1349 of the code. Section 1349.14 outlines the construction standards for buildings in these areas, and 1349.17(b) and 1349.18 authorize the zoning board to hear applications for special exceptions in areas subject to possible flooding. The basic thrust of Article 1349, however, is geared toward construction that adheres to certain safety or floodproofing mandates. As we read this article no construction of any nature can occur in a flood plain area unless and until a zoning permit is obtained under 1349.16(a).

Setback limits and/or requirements, however, are clearly not within the contemplation of Article 1349 and the zoning board recognized that setbacks would have to be given consideration, since from the outset applicant/intervenor's construction plans required relief from the ordinance mandates. He proposed a north side-yard setback of approximately two feet and a rear-yard setback of four feet.[5] The board, although it recognized the prob-

---

5. Under Article 1333.07(e)(2) and (3), the respective setbacks would have had to be approximately eight and seventeen feet.

lem, incorrectly decided that City Council was empowered to waive compliance with setbacks and referred applicant/intervenor to that body for relief. On September 23, 1980, City Council adopted Resolution No. 154-1980, which granted the relief requested by the applicant/intervenor.

We are troubled by the procedure followed by the board in referring applicant/intervenor to City Council for waiver of the normal side and rear-yard setback lines applicable in SPD Districts. From a review of the record and the code we cannot determine any valid basis for City Council's action and this is a matter normally within the province of a zoning hearing board, as expressly provided for in the MPC, 53 P.S. § 10912. Perhaps unfamiliarity with the relatively new concept of Flood Plain Zoning (Article 1349) led to confusion or uncertainty as to the intended scope of this legislation. Doubts in this regard are dispelled, however, when it is remembered that Article 1349 of the code is concerned with *all* of the areas of the city considered to be in a flood plain, and therefore the provisions of the article cut across the various zoning districts provided for in the code. Article 1349 is concerned with: (1) restricting or regulating uses which are dangerous to health, safety or property in times of flood or which cause excessive increases in flood heights or velocities; (2) requiring that uses vulnerable to flooding shall be protected against flood damage at the time of initial construction; and (3) protecting individuals from buying lands which are unsuited for intended purposes because of flood hazard (Article 1349.03).

It does not follow, however, that other provisions of the code are inapplicable to a property simply because it happens to be located within a flood plain area, and the uses and restrictions generally appli-

cable to property in a particular zoning district would continue to be valid and enforceable. We believe permits or exceptions required or permitted by Flood Plain Zoning [Article 1349] are conditions to be superimposed on the other provisions of the code which are applicable to a particular property. In fact, Article 1349.14, which applies to the property in question, specifically states:

"Structural or other uses shall be permitted within the Flood Fringe District as special exceptions *to the extent they are not prohibited by the Zoning Code. . . .*" (Emphasis supplied.)

In our view this language preserves such things as side and rear-yard building lines for property in the flood plain, and these set-backs must be observed until a valid exemption is sought and obtained.

Applicant/intervenor offers two bases for the propriety of what occurred in his case. He first relies on Article 1347.05(c), which empowers City Council to waive compliance with certain limited zoning code provisions "[w]here any such [new] building or structure is to be erected in an area which is congested." However, Article 1347.05, taken in its entirety, addresses only front-yard setback requirements and screening regulations near a residence zone, both of which are irrelevant to the present controversy. Further, we question whether the area of Front Street with which we are dealing is a "congested" area as that word is used in Article 1347.05(c). Finding no definition of "congested" in the ordinance we must resort to the dictionary: "crowded very closely; overcrowded; obstructed by crowding or massing together." Webster's New Twentieth Century Dictionary Unabridged (2d ed. 1975). We doubt that applicant/intervenor's prop-

erty is situated in a "congested area," as contemplated by the ordinance, but cannot determine that question from the record before us.

Another justification for City Council's waiver, according to applicant/intervenor's brief, is Article 1337.04. This article empowers City Council to waive zoning code compliance, again in the undefined "zone or area which is congested," but only in situations where "dwellings or multiple dwellings" are to be erected or when structures are to be "converted" to use as a dwelling. The proposed structure here is clearly not a dwelling and Article 1337 was drafted to address the topic of "Off-Street Parking and Loading." We find no connection between Article 1337 and the issue before us.

Having examined the zoning code, the MPC, case law, and commentary on the issue confronting us, we are convinced that although applicant/intervenor needed a special permit to construct an accessory garage, because his property is located in a flood fringe area of Harrisburg, he could not legally be relieved of the rear-yard and side-yard setback requirements [mandated by Article 1333.07(e)(2) and (3) for an SPD zone] through the vehicle of City Council action.

The proper procedure for applicant/intervenor to follow in this case is to apply for a variance pursuant to the provisions of section 912 of the MPC, 53 P.S. §10912, and any applicable provisions of the City Zoning Code. This conclusion is premised upon the extensive discussion of Pennsylvania case law on special exceptions found in Bray v. Zoning Bd. of Adjustment, 48 Pa. Commonwealth Ct. 523, 410 A. 2d 909 (1980), and upon the lucid outline of distinctions between variances and special exceptions in Lowney Appeal, 46 Pa. Commonwealth Ct. 213, 217, 406 A. 2d 1160, 1162 (1979). The Lowney

court cited the following summary from Ryan, Pennsylvania Zoning Law and Practice §5.1.5:

"An application for a variance . . . seeks permission to do something which is prohibited by the zoning ordinance. A variance is an overriding of the legislative judgment, justified by the existence of 'unnecessary hardship.' In contrast, an applicant for a special exception does not seek to 'vary' the ordinance. The permission he seeks is one envisioned by the ordinance. Accordingly, while an applicant for a variance must show both (a) unnecessary hardship and (b) the fact that a variance would be consistent with the public interest, a special exception case generally involves only the second issue."

In this case the applicant/intervenor was unable to bring his proposal (as to building lines) within the specific requirements of the code and hence the issuance of a special exception was inappropriate, and the terms of the code must be altered to accommodate his plans. He has received only a permit to construct an accessory garage in a flood fringe area, and until a variance is properly granted he must observe the side and rear-yard limits established by the City Zoning Ordinance. His recourse now is to seek to "vary" the ordinance as it would otherwise apply to his premises, and under the MPC the zoning hearing board is the only proper body to consider his request under the facts presented here.

Accordingly, the appeal of the association must be sustained and we will enter an order vacating the permit granted by the board.

## ORDER

And now, February 17, 1981, the within appeal is

sustained and the special exception permit issued in this matter by the Zoning Hearing Board of Harrisburg is vacated.